## UNITED STATES v. ALLEN.

*(District Court, N. D. Illinois. December, 1880.)*

**1. NATIONAL BANKS—FALSE REPORT TO COMPTROLLER—INTENT TO DECEIVE.**
Rev. St. U. S. § 5209, makes it a misdemeanor for officers of a national bank to make false entries in any book, etc., with intent to injure, deceive, or defraud certain persons or associations. *Held*, that such entries must be willfully and intentionally false, and mere clerical mistakes, or an arbitrary exercise of discretion in keeping the books, not amounting to an abuse thereof, are insufficient to constitute the offense.

**2. SAME—FALSE ENTRIES BY CLERK.**
In an indictment of a national bank president under Rev. St. U. S. § 5209, for making false entries in a report to the comptroller of the currency, it is no defense that such entries were made by a clerk, and verified by the president without actual knowledge of their truth, since it was his duty to inform himself, and especially is this the case as regards items showing assets and liabilities.

**3. SAME—INDICTMENT AND PROOF—VARIANCE.**
Where an indictment under Rev. St. U. S. § 5209, alleges the making of false entries in a report of a national bank to the comptroller of the currency, with intent to injure and defraud the banking association and the stockholders thereof, and to deceive its directors, it is not sufficient to prove an intent to deceive other persons, such as creditors, depositors, the comptroller, or the public.

**4. SAME—EVIDENCE OF BANK EXAMINER.**
The testimony of a bank examiner who is a skilled accountant is admissible to show false entries; but it must consist of knowledge derived from his investigation of the books, and not of conclusions based partly upon statements of officers and clerks of the bank.

**5. SAME—EVIDENCE.**
In determining defendant's guilty intent, the jury should consider his relation to the bank as an officer and a shareholder, assistance given the bank by him in its embarrassment by the loan of his individual money, and whether he had any motive for making false entries, together with circumstances that may have induced him to do so, such as an examination by the officers of the bank's affairs at the time the entries were made.

**6. SAME—GOOD CHARACTER.**
Where defendant's fraudulent intent is not sufficiently shown, evidence of his good character would resolve the doubt in his favor, but not if his guilt was conclusively proven.

At Law.

Indictment of Benjamin F. Allen under Rev. St. U. S. § 5209, for making false entries in a statement of the condition of a national bank, made by him, as its president, to the comptroller of the currency.

*Joseph B. Leake,* U. S. Dist. Atty.

*C. C. Cole* and *L. H. Bisbee,* for defendant.

BLODGETT, J., (*charging jury.*) The first two counts of this indictment charge that one Arnold M. Cleveland, who was a clerk in the Cook County National Bank of this city, on the 1st day of May, and the 26th day of June, 1874, made certain false entries in regard to the financial condition of said bank, in reports called for on said days by the comptroller of the currency, and that the defendant aided and abetted said Cleveland in making said false entries or statements. The third count charges that defendant was the president of said bank on the 2d day of October, 1874, and that, as such president, he made certain false entries in regard to the condition of the bank, in a report as to the condition of the bank on said day called for by the comptroller of the currency; and the fourth count charges similar false statements or entries to have been made by defendant, as president of the bank, in a report of the condition of the bank, made to said comptroller on the 31st day of December, 1874,—all which said false entries were made with intent to injure and defraud the said banking association, and the stockholders thereof, and to deceive the directors of said bank.

It is admitted that the Cook County National Bank was organized under the national banking law in the early part of 1872, and that in the spring of 1873 defendant became the owner of a majority of its stock, and became its president, and the active manager of its affairs, and that he continued as such president and manager until the failure of the bank, on the 19th day of January, 1875. The indictment is framed under section 5209 of the Revised Statutes of the United States, which reads as follows:

"Every president, director, cashier, teller, clerk, or agent of any association, who * * * makes any false entry in any book, report, or statement of the association, with intent in either case to injure or defraud the association, or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of the association, and any person who, with like intent, aids or abets any officer, clerk, or agent in any violation of this section, shall be deemed guilty," etc.

You will have noticed from the statute as I have read it to you that the false entries named must have been made with intent to injure or defraud the bank or its stockholders, or any company or individual person; so that an intent to injure the bank, its stockholders, or some other person, is the offense under the law. The law authorizes the comptroller of the currency to call, not less than five times a year, for a full report of the liabilities and assets of the bank, on the close of business

on any day named, and any false statement or entry in any such report, made by an officer of the bank with intent to defraud or to deceive the officers of the bank, or the comptroller, is an offense under the law I have read to you. The entries in these reports which it is claimed were false relate mainly to the amount of bills and notes discounted held by the bank at the times covered by the reports, and to the amount of cash on hand at those several times. The cash is divided in the report into several separate items, such as, amount of national bank-notes on hand; amount of treasury notes on hand; amount of gold and silver coin; amount of fractional currency; amount of funds in hands of reserve agents, etc.

The *first* question to be considered is, were the entries complained of in these various reports, or any of them, false? And were they made by defendant? *Secondly,* were said false entries made by defendant, or did he aid and abet in their being made by Cleveland, with intent to injure and defraud the bank or its stockholders, or to deceive its directors?

In regard to the first subject of inquiry—were the entries in the reports, or any of them, false? and were they made by defendant? The word "false," as used in this law, means "willfully and intentionally false." A mistake in the amount of an item, growing out of accounts in book-keeping, would not make a man guilty under the law. The law intends to punish an intentional misstatement in regard to the affairs of the bank. These reports must show the condition of the bank truthfully. The reports need not agree with the books, either in the statement of assets or the names by which they are called. They may, for instance, call overdrafts "loans," if they are in fact loans, arranged for and understood as such. What I mean is that differences between aggregate items in the report and the books may be explained, for you all understand that a bank could hardly be managed successfully unless its books in some form contained a full history of its business transactions. The comptroller of the currency prescribes the form of the report, and the kind of information it must contain; and, if the books are not so kept as to show these items, in this form, then the statement or report must conform to the truth of the affairs as they actually exist, giving the items of information called for by the comptroller truthfully. The law and the form of report prescribed recognize that in these banks there will be quite an amount which may be carried as cash, and known as "cash items," which will not be in fact cash. In some banks, as appears from the proof, "call loans" are carried as cash. The checks or memoranda evidencing such transactions are counted as cash merely because they represent cash, and are only intended to serve a temporary purpose. And so a bank officer, in making his report to the comptroller, may distribute his overdraft account, and put such as actually represent loans to the class of loans and discounts. The report alone may not show whether the bank is solvent or not. The bank may in good faith have discounted paper and made loans which by changes in business affairs have become either worthless, or greatly depreciated, and

the paper representing such loans or discounts will represent so much money actually due the bank, yet it will not be available. In order, therefore, to determine whether the assets reported as held by the bank are actually good, a bank examiner is appointed, who, by actual inspection from time to time of these assets, and from such information as he can obtain in regard to the solvency of the makers of the paper on hand, decides whether the bank is in a sound condition or not. The law requires a bank to charge off as "bad" all debts on which interest has remained due and unpaid for six months, unless the same is well secured, so that a paper exhibit alone does not show the condition of the bank, but, at most, only shows what its condition would be if its investments were all good and available; and it is doubtful whether a bank has not a right to report among its living assets all regularly discounted paper and loans on which interest has been paid up to within six months, unless required by the bank examiner to charge it off to profit and loss. At least, I do not think the officers of a bank could be charged with fraud in putting such an item into the class of bills discounted, which was, in fact, a regular loan or discount, unless they knew it was worthless, or substantially so.

The offense charged in this case is the alleged making of false entries in the report, and proof has been offered by defendant tending to show that the reports, signed and verified by him, were not in fact made up by him; that they were prepared by some clerk or subordinate in the bank, and that defendant, without any actual knowledge of the truth of the statements contained in the reports, signed and verified them, believing them to be true, because made in the due course of business. Officers of national banks who assume to make reports called for under law must be held responsible for the statements made in these reports, unless, of course, it is made clearly to appear that these statements are the result of a mistake. The defendant cannot be heard to say that he did not know what was in reports made and sworn to by him in the due course of his duty under the law. It is his duty to know whether the report is true or not, and, more especially, when the report in respect to any item in the class of assets or liabilities differs from the books of the bank: so that ignorance of the contents of the report, or of the actual condition of the bank as to the amount of money or other available assets on hand, is no excuse for a false statement made in these reports, because it is from these statements, with the investigations of the bank examiner, that the public and the comptroller determine as to the credit of the bank. Therefore, a bank officer called upon to make reports under the law cannot avoid the responsibility, either civil or criminal, for statements in the report, by showing that they were made by a clerk, and that if false he did not know it. The clerk must be presumed to have written the report under the direction of the officers, who are required to verify and attest it, except as to actual mistakes shown.

The prosecution has offered proof tending to show that there were several false statements in regard to the assets of the bank in each of

the reports referred to in the indictment. A part of the proof thus offered and admitted at the time, subject to objection, was the testimony of Mr. Meigs, who has been for several years bank examiner in the district which includes the city of New York, and was detailed by the comptroller of the currency to examine the books of this bank in the month of March, 1877, the books and papers then being in the hands of the receiver; and he has given testimony as to the results of his examinations tending to show that the statements in the reports under consideration were false in most of the particulars charged, especially in regard to the amount of loans and discounts, and the amount of cash on hand. It cannot be expected that a jury would be able to examine for themselves a complicated set of books like those kept in banking institutions, and from their own examination arrive at any reliable conclusion in regard to the actual condition of the bank; and hence, a skilled accountant, who has had experience in book-keeping, and who has gone through such a set of books, may testify to the results of his investigations as shown by the books. But it appeared from cross-examination, and in reply to questions asked the witness by myself, that Mr. Meigs' conclusions or results to which he testified were not wholly obtained from the books and papers of the bank, but partly from the statements of persons (clerks and officers of the bank) whom he interrogated; so that what he testified to was not solely the showing of the books, but partly the conclusion drawn by Mr. Meigs from information, which he chose to consider true, drawn from other sources. For this reason, his testimony must be excluded, except such parts of it as appear to have been derived solely from an examination of the books; that portion, and that alone, you are at liberty to consider as before you.

The prosecution has also put in the testimony of several other witnesses,—that of Mr. Barret, the book-keeper of the bank; Mr. McQuiston, the teller; Mr. Cleveland, a clerk; and Mr. Burley, the receiver,—who have all given testimony tending to show that the reports contained false statements as to the assets of the bank. This is wholly a question of fact, and to be determined by you in the light of the proof which has been submitted. The law makes you the judges as to the weight of the testimony and the credibility of the witnesses. Much proof has been submitted to you as to the amount of "reserve" on hand, but this is only another name for cash. The law at the time these reports were made required national banks to keep on hand cash equal to 25 per cent. of their circulation and liabilities; that is, they must have this 25 per cent. of their liabilities ready to meet any demand upon them. The balance of their assets could be invested, and 15 per cent. of the reserve of the bank might be in the hands of other national banks, approved by the comptrollers as "reserve agents;" and the proof tends to show false statements in the reports as to the amount of money belonging to this bank in the hands of its "reserve agents." This reserve may also be in the vaults of the bank, and the testimony of Mr. McQuiston tends to show that the top sum, or the amount in the right-hand column of his teller's

book, represented the amount from day to day of cash claimed to be in the vault; and testimony has been given tending to show that the money called for by these figures was not in fact in the vault, or in the possession of the bank. Proof has been offered by the defendant tending to show that the full amount of money called for by the teller's book was in fact on hand up to the last week the bank did business, and was finally exhausted in the payment of protested bills of the bank which had been dishonored by the firm of Allen, Stephens & Co., the bank's principal New York correspondent. The government's proof also tends to show large discrepancies between the amount of loans and discounts as shown by the books and the statements in the report, and this is met by defendant with proof tending to show that large overdrafts were permitted, at or about the time these reports were made, which the bank had a right to treat and report as loans. From all this proof, you are to say whether the allegations in the indictment in regard to false statements in these reports, or any of them, are satisfactorily established by the testimony. If you are satisfied as to the falsity of the statements of the reports, or either of them, the next matter to be considered is, were these false statements made with intent to injure or defraud the bank, or its shareholders, or to deceive the directors? The intent to defraud or deceive is the essence of the offense, and must not only be proven, but must be proven as laid in the indictment. It must appear that the false entries complained of were made with intent to defraud the bank or its shareholders, or to deceive its directors. An intent to deceive other persons, creditors or depositors of the bank, or to deceive the comptroller or the public, in regard to the standing of the bank, will not sustain the charge you are sworn to try; so that the proof must satisfy you, not only that the entries complained of were false, but that they were made with the specific intent alleged.

In determining the question of the defendant's intent, you should take into consideration the relation the defendant bore to this bank, both as an officer and shareholder; and also the testimony in the case tending to show that defendant, besides the money which he put into the stock of the bank at the time he purchased it, also used a large portion of his private fortune in efforts to sustain it; and it is for you to say, in the light of this proof, whether the defendant, by the false statements in the reports, if you find them false, intended to defraud the bank or its stockholders, or to deceive its directors, or whether such statements were made to defraud the depositors or other creditors of the bank, and deceive the comptroller and the public who dealt with it. If the proof does not satisfy you that the intent was to defraud the bank or its shareholders, or to deceive the directors, then the government's case is not made out. In this connection you may properly inquire, in the light of the proof, whether defendant had any motive to defraud the bank. Was he asking credit of the bank at this time, or seeking to obtain any of its property, or could he have been benefited by false reports of its credits, except as a stockholder, or had he any motive for deceiving the directors?

Were any of the directors making inquiries or investigations into the affairs of the bank? And did defendant deem it necessary, for any purpose of his own, to stop such investigation, or quiet any suspicion on the part of his directors? If you find from the proof that such motives existed, they might go far towards satisfying you that the guilty intent existed; but if, on the contrary, you find from the proof that there was no such motive or object on the part of defendant, it should weigh upon the other side of the scale, and at least tend to show there was no such intent as is charged.

And, finally, gentlemen, the prosecution is bound to make out the offense as charged, both as to the falsity of the entries and the intent with which they are made, beyond a reasonable doubt; and, if the proof leaves a reasonable doubt upon your mind either as to the falsity of the entries, or as to the defendant's fraudulent or criminal intent in making them, he is entitled to a verdict of acquittal at your hands. In this connection, it is proper that I call your attention to the proof introduced as to the former good reputation of the defendant for integrity and upright dealing. If the testimony, especially upon the question of guilty intent, leaves it doubtful whether the defendant intended to commit the offense charged, then evidence of good reputation may be allowed to resolve that doubt in favor of the defendant. If the criminal intent charged is so satisfactorily shown as to leave no doubt, then evidence of good character should not be allowed to overcome such proof; but, if the testimony upon that point fairly leaves the question of criminal intent in doubt, then the evidence of good character may properly be allowed to settle that doubt in defendant's favor. If, then, you are satisfied beyond reasonable doubt of defendant's guilt as charged, then you should find him guilty; but if, on the contrary, you find that either the falsity of the entries or criminal intent, as charged, is not proven beyond a reasonable doubt, then your verdict should be not guilty.

**Verdict not guilty,**